**KEY PHARMACEUTICALS, INC.,**
**Plaintiff,**

v.

**Hans LOWEY et al., Defendants.**

**No. 71 Civ. 3854.**

United States District Court,
S. D. New York.

March 20, 1974.

Cahill, Gordon & Reindel, Kaufman, Taylor, Kimmel & Miller, New York City, for plaintiff; Marshall H. Cox, Jr., James A. Shanman, Dean I. Ringel, New York City, of counsel.

Dornbush Mensch Mandelstam & Schwartz, New York City, for defendants; Allen G. Schwartz, New York City, Dale A. Schreiber, of counsel.

## OPINION AND ORDER

CONNER, District Judge.

This action is before the Court on plaintiff's motion for leave to file a Second Amended Complaint and defendants' motion for an increase in the security posted by plaintiff.

The action is the outgrowth of a series of agreements between plaintiff and the first three named defendants relating to "sustained action" pharmaceuticals (the active ingredients of which are released into the bloodstream gradually over an extended period).

Without referring to all of the agreements or attempting to review in detail the substance of their terms, it will suffice for present purposes to say that by the three basic agreements, entered into concurrently on March 1, 1950, defendant Lowey granted plaintiff Key Pharmaceuticals, Inc. ("Key") an exclusive license to make, use and sell in the United States and 11 foreign countries sustained action pharmaceuticals produced by the process described in Lowey's pending U.S. patent application "and the trade secrets applicable thereto." Key agreed to pay Lowey specified royalties "on all sustained action formulations fabricated into tablets by Key and sold * * *." Lowey and his wholly owned corporation, defendant Bonded Laboratories, Inc. ("Bonded") agreed to sell sustained action formulations only to Key in the licensed territory, and Key agreed to purchase from Bonded its entire requirements of such formulations, apparently in perpetuity. The contracts specifically provided that Key's obligation to pay royalties and to buy exclusively from Lowey and Bonded would continue even if no claims were ever allowed in the patent application, or if all of the allowed claims were finally adjudicated to be invalid. The "trade secrets" were to be disclosed in a sealed envelope, which was not to be furnished to Key unless and until Bonded, for example, due to the death of Lowey, was unable to fulfill its obligation to supply Key's requirements of the formulations. Key further agreed that it would not market any sustained action pharmaceuticals outside of the licensed area.

In 1956, the three agreements were amended so that Key was required to purchase from Bonded its resale requirements of only three types of sustained action formulations, including the nitroglycerin product of greatest commercial significance to Key.

By 1959, Key had developed and put into production a process of its own for producing sustained action pharmaceuticals (on which it subsequently obtained a patent), and a dispute arose between the parties as to whether royalties were payable to Lowey on the products of this process. The matter was compromised in 1964 by entering into a new agreement which superseded and terminated all of the earlier agreements.

In the 1964 agreement, Key and Lowey each conceded the validity of the patents of the other. Key agreed that it would not sell the three types of sustained action formulations except in the United States, Canada and Venezuela, and that Bonded would have the right to use Key's trademarks for such formulations in the rest of the world. Bonded agreed not to produce such formulations by any method covered by any patent owned by Key and further agreed not to make any of the formulations in the United States except for distribution abroad. Key agreed to pay specified "royalties" to Lowey and Bonded on all its sales and distributions of the three types of formulations, however produced, apparently in perpetuity. Finally, the agreement provided that any disputes arising thereunder would be submitted to arbitration.

In 1971, a dispute arose as to the royalties payable under the 1964 agreement, and Lowey threatened to invoke the arbitration clause. Key instead proceeded to file the present action seeking, in the original complaint, recision of the 1964 agreement on the ground of fraud in its inducement. Defendants thereupon instituted an arbitration proceeding and

moved for a stay of this action pursuant to the provisions of the Federal Arbitration Act, 9 U.S.C. § 3, as applied in Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L. Ed.2d 1270 (1967).

Key countered by moving to amend the complaint to include an antitrust count charging that the 1964 agreement violated the Sherman Act, 15 U.S.C. § 1—an issue not referable to arbitration. See American Safety Equipment Corp. v. J. P. Maguire & Co., 391 F.2d 821 (2d Cir. 1968). On this basis, Key also moved for stay of the arbitration pending final determination of the action.

On February 23, 1972, in a decision reported at 54 F.R.D. 447, Judge Edward Weinfeld granted both Key's motion to amend and its motion for stay, conditioned upon Key's posting security for the payment of royalties which had theretofore accrued and those estimated to become due during the pendency of the action.

Since that time, Key has obtained new counsel and considerable discovery has been completed. Key's present counsel have now moved for leave to file a Second Amended Complaint by which they propose (1) "to set out with greater precision * * * the factual bases and underlying legal theories for the antitrust count," (2) "to add a count alleging that the same conduct * * * which has violated the antitrust laws also constitutes actionable misuse of defendants' process patent," (3) to add a prayer for declaratory judgment, and (4) to delete the claim of fraud in the inducement of the 1964 agreement.

Key asserts that all discovery "has been concluded" and that the proposed amendment will not inject any new factual issues into the case nor delay its trial. Defendants disagree, arguing that the amendment will "radically" alter not only the legal theory but also the factual basis of the case and require "extensive" additional discovery.

As between these two extreme positions, Key's appears closer to the reality of the situation. The Amended Complaint now on file charges that the 1964 agreement violates the antitrust laws by prohibiting each party from competing in the territory assigned to the other and by requiring the payment of royalties beyond the expiration of the licensed patent. The proposed Second Amended Complaint repeats the substance of these allegations and adds the charge that the 1964 agreement violates the antitrust laws by requiring Key to pay royalties on products made by it using Key's own process, and to exact and pass on to defendants specified minimum royalties from any others to whom Key grants licenses under its own patent, with the result that Lowey has "improperly extended his patent monopoly."

Although this is indeed a new issue in the case, it does not appear to require extensive discovery. The terms of the 1964 agreement are not in dispute. That agreement on its face expressly obligates Key to pay royalties to defendants on all of the three named types of sustained action pharmaceuticals sold or distributed by it, without apparent limitation to products of processes covered by the Lowey patent.

Insofar as the validity of this provision is concerned, it would appear to be immaterial what process Key is actually using, for it is required to pay royalties on the specified products in any case.

Defendants contend, in effect, that these so-called "royalties" are not consideration for a patent license, but for the termination of the 1954 and 1956 agreements. Plaintiff counters that this does not avoid the problem, because the 1954 and 1956 agreements were also illegal and the termination of illegal agreements cannot furnish legal consideration for a new agreement; instead, the new agreement itself is tainted by the illegality of its predecessors. See Columbus Automotive Corp. v. Oldberg Mfg. Co., 264 F.Supp. 779 (D.Colo.1967), aff'd, 387 F.2d 643 (10th Cir. 1968).

The fact that Key has, in Paragraphs 37 and 44 of the proposed Second Amended Complaint, alleged that certain provisions of the 1954 and 1956 agreements violated the antitrust laws has prompted defendants to point out that, at the time of the execution of the 1964 agreements, each party expressly released and discharged the other from all claims which it had against the others up to that time, including any causes of action arising out of the earlier agreements. While this appears to be true, the Second Amended Complaint does not seek any recovery based upon the 1954 and 1956 agreements *per se*. Instead, it alleges that because, under the legal principle discussed above, the termination of the earlier agreements could not furnish valid consideration for the continuing payments called for in the 1964 agreement, the only consideration for these payments must be the patent license; since these "royalties" were required to be paid on the sales of products of unpatented processes, and were required to extend beyond the expiration of the licensed patent, the patent was misused by extending its monopoly both in scope and in term.

Defendants further argue that the allegation of illegality of the earlier agreements opens up many more new issues as to which extensive discovery will be required. However, it appears that the only allegedly illegal provision of the 1954 agreements which was not carried forward into the 1964 agreement was the so-called "tying" provision by which Key was required to purchase from Bonded its entire requirements of specified materials. Defendants argue that since "requirements" contracts are not *per se* illegal, this new issue will require evidence as to the extent of the relevant market, the anti-competitive impact of the contract in such market, and so on.

While defendants' underlying legal premise that requirements contracts are not illegal *per se* is valid as a general proposition, the 1954 agreements were far from typical. In the first place, they apparently ran in perpetuity. Even more importantly, it appears that the "requirements" provisions were a pre-condition for the grant of the patent license. If the licensee was required, as a condition of the license, to purchase unpatented materials from the licensor, this would constitute a misuse of the licensed patent. Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Such a tying arrangement is a *per se* misuse requiring no proof of substantial lessening of competition. Berlenbach v. Anderson & Thompson Ski Co., 329 F.2d 782, 784 (9th Cir.), cert. denied, 379 U.S. 830, 85 S.Ct. 60, 13 L.Ed.2d 39 (1964).

Moreover, even if defendants will require further discovery (plaintiff represents that *it* will not), the Court is nevertheless disposed to permit the amendment so that the case can be brought to trial on its real merits, rather than foreclosing issues because of procedural imperfections. Rule 15(a), F.R.Civ.P. provides that leave to amend "shall be freely given when justice so requires" and in Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) the U.S. Supreme Court has admonished that "this mandate is to be heeded" and that a plaintiff "ought to be afforded an opportunity to test his claim on the merits" in the absence of apparent "bad faith or dilatory motive." See also Middle Atlantic Utilities Co. v. S. M. W. Development Corp., 392 F.2d 380 (2nd Cir. 1968).

The Court should be particularly lenient in allowing amendment of the pleadings to raise issues of patent misuse and consequent unenforceability since "the possession and assertion of patent rights are 'issues of great moment to the public'." Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 815, 65 S.Ct. 993, 998, 89 L.Ed. 1381 (1945), quoting from Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). The implementation of this public policy is not "at the mercy of

the parties," but the Court should, even *sua sponte*, refuse to enforce patents which have been misused by attempting to extend the patent monopoly. Vitamin Technologists v. Wisconsin Alumni Research Foundation, 146 F.2d 941, 944–945 (9th Cir. 1944).

Defendants have filed a counter motion asking the Court, particularly in the event that plaintiff's motion to amend is granted, to order plaintiff to post additional security to cover the continuing liability for royalties under the 1964 agreement. In an affidavit filed in support of defendants' motion, it is stated that Judge Weinfeld set the security at $200,000 based upon a computation of $70,000 in royalties then claimed to be due, plus an estimated $60,000 in claimed royalties which might be expected to accrue during each of the next two years before the date of disposition then anticipated. Defendants urge that the security should now be increased because the accrued royalty was understated (defendants have also filed an affidavit of Key's former president, James Marshall, asserting that it was), and because the case was not reached for trial in 1973, as Judge Weinfeld anticipated, and will be delayed still further if the motion to amend is granted.

These contentions have been carefully weighed, along with all the surrounding circumstances, including the affidavit of Key's current president, Michael Jaharis, Jr., concerning Key's present financial responsibility, and Key's claim for refund of the $342,956.57 in royalties it has paid under the 1964 agreement in consequence of the illegality of that agreement. In the light of all these considerations, the present security is deemed adequate to protect defendants' interests.

In the interest of all the parties, the Court will attempt to set the case for trial as soon as possible after the parties indicate that they are ready. Plaintiff will be held to its representation that it needs no further discovery. Defendants will be given 90 days from the date of this order to complete any additional discovery required. Either party may apply for relief from these limitations on a showing of good cause.

Plaintiff's motion for leave to file the Second Amended Complaint is granted. Defendants' motion for increased security is denied.

So ordered.